J. D. Wineland v. Commissioner. J. D. Wineland, Transferee of Mystic Theatre, Inc., v. Commissioner. Mystic Theatre, Inc. v. Commissioner.
Wineland v. Commissioner
Docket Nos. 26381, 26382, 26383.
United States Tax Court
1951 Tax Ct. Memo LEXIS 93; 10 T.C.M. (CCH) 919; T.C.M. (RIA) 51294; September 26, 1951
*93 Emerson Foulke, Esq., for the petitioners. D. Louis Bergeron, Esq., and W. B. Riley, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies and penalties against petitioners as follows: Mystic Theatre, Inc., Docket No. 26383: Declared
Excess
Income
Value Excess
Profits
Year
Tax
Profits Tax
Tax
Penalty
Totals
1942
$ 589.47
$ 897.59
$ 4,031.66
$1,007.92 *
$ 6,526.64
1943
791.59
1,049.62
4,908.71
1,227.18 *
7,977.10
1944
1,009.14
440.66
1,449.80
1945
2,235.60
28,827.16
31,062.66
J. D. Wineland, Docket No. 26381: ** Year
Deficiency
1943 Income and victory tax
$ 2,036.98
1944 Income tax
301.00
1945 Income tax
11,624.05
1946 Income tax
1,282.24
J. D. Wineland, Transferee, Docket No. 26382: Deficiencies and penalties identical to those assessed against Mystic Theatre, Inc. By amendment to his *94 answer respondent requests in the alternative that if petitioner Mystic Theatre, Inc., is found not liable for excess profits taxes in 1942 and 1943, or, if due to adjustments such taxes are reduced in whole or in part, that income tax deficiencies be increased by $1,170.13 in 1942 and $514.63 in 1943. The questions originally raised were: 1. What is the adjusted basis of the assets petitioner J. D. Wineland transferred to Mystic Theatre, Inc., on the date of incorporation of the latter? 2. Was petitioner Mystic Theatre, Inc., a taxable entity? 3. Did respondent err by allowing only a $3,000 deduction to Mystic Theatre, Inc., for salary paid to its controlling shareholder and manager, J. D. Wineland, during each of the years in issue? 4. Was J. D. Wineland entitled to a deduction of a portion of his car expenditures in 1942 and 1943? 5. Did respondent err in limiting to an offset against capital gain 25 per cent of the attorney's fees incurred incident to a suit for damages on the ground they were attributable to the sale of Mystic Theatre, Inc.? 6. Were the damages received in settlement of the suit constructively received in 1945? 7. Is Mystic Theatre, Inc., liable *95 for a 25 per cent penalty for failure to file corporation excess profits tax returns for the years 1942 and 1943? It is agreed that J. D. Wineland's income from Mystic Theatre, Inc., from 1942 to 1945, inclusive, included all net proceeds of the theatre whether transferred to him in the form of salary payments or dividends. The parties disagree, however, on the depreciation deduction allowable to Mystic Theatre, Inc., in the determination of its net proceeds, which dispute arises solely from their failure to agree on the undepreciated basis of the theatre properties transferred to Mystic Theatre, Inc., on its incorporation. Our disposition of the first issue listed above will settle the latter question. The parties also agree that the organization of Mystic Theatre, Inc., involved a tax-free exchange. Petitioner J. D. Wineland concedes the correctness of respondent's determination of gross liquidation dividends received by him in 1945 and 1946, but disputes respondent's determination of the basis of his stock. Inasmuch as Wineland's basis for the stock received in exchange for the property transferred to Mystic Theatre, on organization of the latter, is a substituted basis, our *96 determination of the adjusted basis of that property also fixes the basis of his stock and in turn disposes of questions relating to net liquidation dividends received in 1945 and 1946. Petitioner J. D. Wineland's transferee liability which turns upon whether petitioner Mystic Theatre, Inc., was a taxable entity during the tax period is apparently conceded, petitioners having presumably abandoned the latter question which is not mentioned in their brief. Some of the facts have been stipulated. Findings of Fact The stipulated facts are hereby found. Petitioner J. D. Wineland, hereinafter referred to as petitioner, was a resident of Picher, Oklahoma, during the period material herein. He filed his income tax returns with the collector for the district of Oklahoma for the years 1942 to 1945, inclusive, and with the collector for the sixth collection district of Missouri in 1946. Petitioner reported his income on the cash basis of accounting. On May 2, 1919, for the purpose of erecting a theatre building, petitioner acquired a leasehold or ground license to Lots 10 and 11, Block 2, of the original town of Picher, Oklahoma, for $1,800. On the same day he secured a lease on the west *97 two rooms of a concrete building situated on Lot 12, Block 2, at a rental of $480 annually. He acquired an option to purchase these two rooms within one year for $2,500, less rent paid up to the time of purchase, which he exercised in 1920. Construction of a two-story theatre building was begun after acquisition of Lots 10 and 11. The first floor, which comprised the theatre, and the framework and roof of the second floor were completed in 1919 at a cost of $18,000. The second floor, containing a nine-room apartment, was finished in 1920 at a cost of $2,000. Petitioner began living in the apartment in about June 1920, and continued to live there to and including the years in issue, with the exception of a period from 1930 to 1933 when he was forced to vacate during bankruptcy proceedings [1] About one-fourth of the building was used as petitioner's personal residence. In 1926 petitioner purchased Lot 9 of Block 2, being the lot north of the theatre, for $1,500. A building 20 feet wide *98 and 120 feet long, an addition to the theatre and of the same type construction, was erected on this lot. The cost was $2,000. Additional improvements were made when petitioner regained the property in 1933 after the bankruptcy proceedings. A gallery on the stage was added and a sound equipment booth was installed. These additions, both of a permanent nature, cost $2,500. From the date that he began operation of the theatre in about 1919 until September 3, 1940, petitioner operated as a sole proprietor. On the latter date he organized petitioner Mystic Theatre, Inc., hereinafter sometimes referred to as Mystic, transferring to Mystic his ground licenses with all improvements and equipment in exchange for the 3,000 shares of Mystic's authorized stock. The equipment had an adjusted basis as of that date of $1,000. At the time of the exchange there was no outstanding indebtedness against the property transferred. A board of directors was formed with John L. Stauffer serving as president, Ruth Clark as vice president, and petitioner as secretary-treasurer and manager. Maxine Richardson (Maxine Wineland after her marriage to petitioner in 1945) was elected to the board to serve as vice-president *99 in 1942 after Ruth Clark resigned and the former continued to serve until dissolution. The board met at least once a year, fixed petitioner's salary each year as manager at $3,000, and voted to declare no dividends. During the period 1942 to 1945, inclusive, Mystic purchased 39 government bonds at a total cost of $29,626.25. Sometime prior to December 1945 petitioner and Mystic instituted a damage suit against Griffith Consolidated Theatres, Inc., (hereinafter referred to as Griffith), a Delaware corporation authorized to do business in Oklahoma. George S. Ryan, a Boston, Massachusetts, attorney, represented petitioner and Mystic in this action. In subsequent negotiations to settle the controversy petitioner agreed to accept $25,000 damages if Griffith would also purchase the theatre, the ground licenses and all appurtenances for $50,000. Three days later this proposal was modified to provide for $17,500 damages; the theatre price remained the same. The modified gross settlement figure was accepted by Griffith's New York office via telephone, with the understanding that all papers in settlement of the controversy would be prepared in Oklahoma City, Oklahoma, and be presented to *100 petitioner in his office in Picher. No part of Ryan's services nor that of any other of petitioner's legal representatives incident to that action was related to sale of the theatre property. As a result of an unexplained difficulty between petitioner and Ryan in regard to the latter's fee, Ryan notified Griffith to include his name as payee on the checks in settlement of the damages claim. Griffith notified petitioner of the proposed change and he, in turn, called Ryan for an explanation. Ryan announced that he would not endorse the checks until he received $6,000 as his fee. On December 19, 1945, there was presented to petitioner in settlement of the controversy a purchase contract and bill of sale providing for acquisition by Griffith of the entire theatre property including the building, ground licenses, fixtures, equipment, and all other personal property connected therewith. Three checks were included; one for $30,000 with petitioner and Mystic as payees was in payment for the theatre properties; the other two, cashier's checks for $20,000 and $17,500, respectively, drawn to the order of petitioner, Mystic, and George S. Ryan, the attorney, were in payment of the damages. *101 On discovering that the allocation between damages and purchase price was different from that previously agreed to, petitioner called his attorney and accountant, complaining of the change. They suggested that he accept the payment since there was no variance in the total settlement figure, which suggestion petitioner followed. Because of inclement weather petitioner delayed cashing the $30,000 check and taking preliminary steps toward cashing the other two checks until December 22, 1945. On this latter date he deposited the $30,000 in his personal account in the Security Bank and Trust Company of of Miami, Oklahoma. He drew a check for $6,000 payable to the order of George S. Ryan which was sent with the two checks for $20,000 and $17,500, respectively, to the Security Bank and Trust Company's correspondent bank in Boston with directions to notify Ryan to endorse the two checks for damages and pick up the $6,000 check for attorney's fees. On January 11, 1946, petitioner was notified by the Security Bank and Trust Company of their receipt of the two checks endorsed by Ryan. Petitioner immediately endorsed and deposited the two checks in his personal account. Pursuant to notice, *102 given December 6, 1945, a special meeting of Mystic's stockholders was held on December 17, 1945, in the theatre office. Those present as recorded in the corporate minutes were John L. Stauffer, owning one share, Maxine Wineland, owning two shares, and petitioner, owning 2,996 shares. Ruth Clark, owner of one share, was absent. The minutes then note that all qualifying steps had been taken for dissolution of Mystic and that a resolution was adopted directing the officers to proceed therewith. On January 29, 1946, by Decree of Dissolution promulgated by the District Court of Ottawa County, Oklahoma, Mystic was dissolved. Mystic kept its books and filed Federal income tax returns during the years 1942 to 1945, inclusive, on the cash receipts and disbursements basis of accounting. It included among asserted expenses in the last three of these years franchise and capital stock taxes. A deduction of $3,000 was taken in each year in issue as compensation paid to petitioner as manager. Petitioner actually received during this period the excess of Mystic's annual gross income from operations less expenses and money invested in government bonds. Mystic filed no excess profit tax returns *103 for the taxable years 1942, 1943, and 1944. In its 1945 corporate income and declared value excess profit tax returns Mystic reported, in addition to gross receipts from the operation of the theatre, the damages recovered on settlement of the Griffith controversy totaling $37,500 as well as the $30,000 proceeds from the sale of the theatre properties. Mystic set off against the item of $37,500 for damages recovered $14,477.09 as expenses for asserted itemized attorney's fees and miscellaneous expenditures. From the $30,000 sale proceeds was subtracted an alleged building and equipment basis of $22,000 and $4,584.45, respectively. The balance was reported as a long-term capital gain. From 1942 to 1945, inclusive, petitioner reported his $3,000 salary from Mystic as his only income. In 1946 he reported $37,500 as liquidation dividends. Included among deductions from the dividends was an item "Cost of Stock 1940" of $3,000. By notice mailed October 13, 1949, respondent determined, among the several adjustments to income, that Mystic realized gain on the sale of its assets of $12,085.96, in addition to the $3,415.55 reported. The following original costs were assigned to some of the *104 properties listed as sold: Beginning
Property
Cost
Depreciation Date
Building built in
1918
$18,000.00
1/2 year in 1918
Building addition
1926
2,000.00
1926
Land lease: Lot 1
2,500.00
Lot 2
1,500.00 In addition to these properties, less depreciation computed to the date of Mystic's incorporation, were listed the undepreciated cost of equipment and a truck on that date of $1,000 and $100, respectively. From the total adjusted bases of these properties there was deducted, for the purpose of determining the basis of the property petitioner transferred to Mystic, $991.06 described as a "mortgage assumed by corporation and subsequently paid." Respondent determined that Mystic received net taxable gain from the damage suit settlement of $31,461.42, $37,500 less legal fees of $6,038.58. This latter figure was a proportion of total fees allowed of $8,051.44, 25 per cent ($2,012.86) of which was allocated to sale of the theatre assets and 75 per cent to settlement of the damage suit. It is agreed that $10,500, including George S. Ryan's fee, was expended for settlement of the suit. No part of this expenditure related to the sale of the theatre property. *105 Petitioner acquired Lots 10 and 11 in 1919 for $1,800 and completed the theatre building that year, with the exception of the second floor apartment which was concluded in 1920 at an additional cost of $2,000. In 1926 the adjacent Lot 9 was acquired and a $2,000 addition to the theatre building was constructed. Permanent fixtures costing $2,500 were added in 1933. Throughout the period in issue petitioner utilized the second floor apartment, comprising in value about one-fourth of the theatre building, as a home. There was no mortgage or indebtedness on the theatre properties when transferred to Mystic in 1940. Opinion I. In addition to the originally controverted question of Mystic's existence as a taxable entity which we regard as now abandoned by petitioner, and cf. , several other issues raised by the pleadings must now be treated as discarded. Either an absence of evidence, or of any enumeration on brief as an existing controversy, or both, apply to the issues as to deductibility by Mystic of a larger salary to petitioner; of deductibility of petitioner's expense of operating an automobile; and of the propriety *106 of penalties imposed upon Mystic for failure to file excess profits tax returns for 1942 through 1944. These points will accordingly not be further noticed. II. The adjusted basis of the assets transferred to Mystic by petitioner in consideration for its stock in what is accepted as a tax-free exchange depends on two disputed subsidiary questions and in turn disposes of two major issues. The latter are: What was the gain realized on the sale of the assets by Mystic; and what was petitioner's basis for his Mystic stock. There being no dispute as to what petitioner received on Mystic's dissolution, the extent of his gain will then be a mere matter of arithmetic. The subordinate issues are mainly factual and have been disposed of by our findings. We have accepted petitioner's testimony wherever it was made the subject of express statement, but cannot fill in gaps in the evidence by assumptions. For example, we are satisfied that the theatre building was completed in 1919; but since there is no precise evidence of the day or month, we have concluded that depreciation was allowable for the entire year, and must be computed accordingly in arriving at the adjusted basis. Under the recomputation, *107 these issues can be disposed of in accordance with our findings. III. The issue argued in petitioner's brief under the heading "Date of Receipt of the Proceeds of the Settlement of the Lawsuit" refers to the time when the settlement payment resulting from Mystic's litigation should be taken up in income. The attorney insisted that he should be included as one of the payees named in the checks by which this settlement was accomplished. It is petitioner's contention that until the check was returned with the attorney's endorsement, the payments did not represent income to a cash basis taxpayer. The point is argued, however, as though it was only petitioner's income that was affected. For all that appears from the facts it may well be that the check was distributed to petitioner in liquidation in the prior year. At any rate the question of the time of receipt by the corporation is not referred to in the argument on brief. Cf. , certiorari denied, . What the brief states is that: Under these statutes * * * it is clear that the $37,500.00 received by Wineland as a liquidating *108 dividend in the dissolution of the Mystic Theatre, Inc., could not be held to have been constructively received until the date when it was credited to his account * * *. * * *
They were received back by the Miami Bank with Ryan's [the attorney's] endorsement on the 11th day of January, 1946, and on the same day Wineland went to the bank and deposited both checks in his account and for the first time had the funds in his control and possession. Mystic reported the payments as received in 1945. We are not satisfied from the facts and the manner in which the case was presented that this was error. Respondent's position in this regard must accordingly be sustained. IV. The final question is whether some part of the attorney's charges should be allocated to the sale of Mystic's assets, in lieu of all being attributed to settlement of the litigation, thus giving Mystic, and petitioner as transferee, the benefit of only an offset against capital gain instead of an ordinary income deduction. This matter also we view as entirely factual. The evidence discloses that, although the sale was made at the same time the litigation was settled, the purchaser being the defendant in the *109 litigation, and although it was a condition imposed at the insistence of Mystic, no services were rendered by the attorney in connection with the sale, no benefit accrued beyond a fair price for the property, and hence the attorney would have had no justification for charging any fee for this part of the transaction. It seems to us to follow, as we have set out in our findings, that no part of the payment to the attorney was allocable to the sale, but that the entire fee is attributable to the litigation. The deduction of the entire amount from the proceeds of the settlement was therefore proper. Decisions will be entered under Rule 50. Footnotes
*. The 25 per cent penalty was determined for delinquent filing of excess profits tax returns.↩
**. The year 1942 is involved by reason of the forgiveness feature of the Current Tax Payment Act of 1943.↩
1. (D.C.Okla., 1933) determined that the homestead exemption applied to the bankrupt's theatre property and apartment because lived in as a home.↩